Timothy FAGAN, Plaintiff,

v.

AMERISOURCEBERGEN CORP., Amgen Inc., CVS Corporation, ProCare Pharmacy, Inc. and "John Doe Corporations 1–100" (fictitious names for Corporations who manufactured, distributed, or sold the drugs that are the subject of this suit and the containers the drugs were packaged and/or shipped in), Defendants.

No. CV–03–3787 SJF WDW.

United States District Court, E.D. New York.

July 29, 2004.

Eric Turkewitz, The Turkewitz Law Office, New York, NY, for Plaintiff.

Debra O'Gorman, Dechert LLP, Loretta E. Lynch, Hogan & Hartson L.L.P., New York, NY, Mark D. Gately, Hogan & Hart-son L.L.P., Baltimore, MD, Michael L. Kidney, Hogan & Hartson L.L.P., Washington, DC, Robert Ortiz, McAndrew, Conboy & Prisco, Woodbury, NY, for Defendants.

## OPINION & ORDER

FEUERSTEIN, District Judge.

Timothy Fagan (plaintiff) commenced this diversity action against defendants AmerisourceBergen Corp. (ABC), Amgen Inc. (Amgen), CVS Corporation (CVS), ProCare Pharmacy, Inc. (ProCare), and "John Doe Corporations 1–100", (collectively, defendants) to recover damages for personal injuries, alleging claims for negligence, breach of the implied warranties of merchantability and fitness for a particular purpose, breach of an express warranty, negligent misrepresentation, and fraudulent concealment.

Amgen and ABC have moved for dismissal of the complaint pursuant to Fed. R.Civ.P. 12(b)(6), and CVS and ProCare (collectively, CVS ProCare) have moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). In addition, ABC has moved pursuant to Fed.R.Civ.P. 12(b)(6) for dismissal of the cross claims asserted by CVS ProCare against it. For the reasons set forth herein, Amgen's motion is granted and the complaint is dismissed in its entirety as against Amgen; the motions of ABC and CVS ProCare are granted in part and denied in part; and plaintiff is granted leave to amend the complaint to replead the breach of an express warranty claim as against CVS ProCare.

## I. BACKGROUND

### A. Factual Background [1]

#### 1. The Parties

Plaintiff is an 18 year old male who resides in Suffolk County.

---

1. As is required on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the factual alle-gations in the complaint, though disputed by

Amgen is a Delaware corporation with its principal place of business in California. Amgen manufactures the prescription drug Epogen.

ABC is a Delaware corporation with its principal place of business in Pennsylvania. ABC is a wholesale distributor of pharmaceuticals, including Epogen. According to plaintiff, ABC was an "authorized distributor" of Amgen, but also bought Epogen and other medications from secondary sources constituting a "gray market."

CVS is a Delaware corporation with its principal place of business in Rhode Island. ProCare is a Rhode Island corporation with its principal place of business in Rhode Island, and is a subsidiary of CVS. CVS ProCare, *inter alia*, sells and delivers prescription drugs to consumers via mail.

"John Doe Corporations 1–100" are fictitious names for corporations which manufactured, distributed, or sold Epogen and the containers in which the drug was packaged and/or shipped.

### 2. Factual Allegations

Following a liver transplant on February 15, 2002, plaintiff's doctor prescribed Epogen, at a dosage of 40,000 units per milliliter, to be injected once a week. According to plaintiff, CVS ProCare purchased Epogen from ABC, then sold and delivered it to him via mail on or about March 20, 2002. Plaintiff further alleges that in mid-April 2002, he received a second shipment of Epogen from CVS ProCare, labeled "Lot # P0010191 (Exp. 9/02)."

Plaintiff alleges that Amgen posted a letter dated May 8, 2002 on its website advising that there was counterfeit Epogen in the marketplace, bearing Lot # P002970. Amgen further advised that

the counterfeit lot could be determined by examining the vial label, which omitted the degree sign from the temperature at which the drug should be stored. In addition, Amgen advised that although the counterfeit drug contained the active ingredient, the dosage was one-twentieth (1/20th) the strength set forth on the label.

Plaintiff alleges that on or about May 14, 2002, CVS ProCare called him to inform him that there was counterfeit Epogen in the marketplace. According to plaintiff, on or about May 15, 2002, CVS ProCare delivered to him a third shipment of Epogen, labeled "Lot # P002970 (exp. 7/03)," which was the lot designated as counterfeit on the Amgen website.

Plaintiff alleges that on or about May 20, 2002, he discovered that the second shipment of Epogen that he received from CVS ProCare, labeled "Lot # P001091," also omitted a degree symbol from the storage temperature on the label. On or about May 24, 2002, Amgen identified Lot # P0001091 as also being counterfeit.

Plaintiff alleges that the weekly injections of the counterfeit Epogen continued for two months and that, as a result, *inter alia*, he suffered from continued anemia and excruciating side effects, and his recovery from the liver transplant was delayed.

### B. Procedural Background

On or about August 4, 2003, plaintiff commenced this diversity action against defendants to recover damages for personal injuries he allegedly sustained as a result of the weekly injections of the counterfeit Epogen for two months. Plaintiff asserts causes of action seeking damages for negligence, breach of the implied war-

defendants, are accepted to be true for purposes of this motion, and all reasonable inferences are drawn therefrom in favor of plaintiff. They do not constitute findings of fact by this court.

ranties of merchantability and fitness for a particular purpose, breach of an express warranty, fraudulent misrepresentation, and fraudulent concealment. In addition, plaintiff seeks punitive damages.

Amgen and ABC have separately moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss plaintiff's complaint against them for failure to state a claim; and ABC further moves to dismiss the cross claims asserted against it by CVS ProCare. CVS ProCare moves pursuant to Fed.R.Civ.P. 12(c) for judgment on the pleadings.

## II. DISCUSSION

### A. Standard of Review

#### 1. Fed.R.Civ.P. 12(b)(6)

A motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6) should be granted only where "it appears beyond a doubt that plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Levitt v. Bear Stearns & Co.,* 340 F.3d 94, 101 (2d Cir. 2003) (internal quotations and citations omitted). In deciding a motion to dismiss, the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See, Cargo Partner AG v. Albatrans, Inc.,* 352 F.3d 41, 44 (2d Cir.2003); *New v. Ashcroft,* 293 F.Supp.2d 256, 257 (E.D.N.Y.2003). The court's task "is merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Levitt,* 340 F.3d at 101 (internal quotations and citations omitted). The issue is not whether a plaintiff will ultimately prevail but whether he or she is entitled to offer evidence to support the claims. *See, New,* 293 F.Supp.2d at 257 (citing *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 [2d Cir.1995] ).

#### 2. Fed.R.Civ.P. 12(c)

The standard of review on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) is the same standard applied to a motion for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). *See, Ziemba v. Wezner,* 366 F.3d 161, 163 (2004); *Oneida Indian Nation of New York v. City of Sherrill, New York,* · 337 F.3d 139, 152 (2003).

### B. Negligence

#### 1. Amgen

Amgen contends, *inter alia,* that it cannot be held liable for injuries sustained as a result of changes made to its product after the product left its control, and that it did not have a duty (1) to makes its product tamper-proof; (2) to continuously monitor its products from the time they leave its control until the time they are purchased by the consumer; or (3) to protect the public from the criminal misuse of its products, even if such use was foreseeable.

Plaintiff contends, *inter alia,* that Amgen owed him a duty of care because (1) he had a reasonable expectation that the manufacturer of Epogen would owe him a duty of care; (2) holding manufacturers of prescription drugs liable for failing to adequately safeguard their products will not result in an unreasonable proliferation of claims, as liability would be limited to those consumers who suffered a personal injury as a result of consuming a defective drug; (3) there is no likelihood that manufacturers of prescription drugs will be held to unlimited liability merely because they owe a duty of care to consumers of their drugs; (4) as a manufacturer of prescription drugs, Amgen is in a better position to protect against the risk of harm to users of the drugs by packaging them in tamper-resistant materials and warning those in the distribution chain to be on the alert for

altered or tampered products and the dangers of the "gray market;" and (5) holding Amgen liable would not create a new "channel" of liability, since a manufacturer has a duty to take reasonable steps to make tampering with its product more difficult.

■ In order to prevail on a negligence claim under New York law, a plaintiff must establish (1) that the defendant owed him or her a duty of care; (2) that the defendant breached that duty; and (3) that the defendant's breach was the proximate cause of the plaintiff's injuries. *See, Johnson v. Bryco Arms*, 304 F.Supp.2d 383, 394 (E.D.N.Y.2004)(citing *Akins v. Glens Falls City Sch. Dist.*, 53 N.Y.2d 325, 333, 441 N.Y.S.2d 644, 424 N.E.2d 531 [1981] ). In New York, the existence of a duty of care is a "legal, policy-laden declaration reserved for judges." *In re September 11 Litigation*, 280 F.Supp.2d 279, 290 (S.D.N.Y.2003)(citing *Palka v. Servicemaster Mgmt. Servs. Corp.*, 83 N.Y.2d 579, 611 N.Y.S.2d 817, 634 N.E.2d 189 [1994] ). The plaintiff must establish not only that a defendant owed a general duty of care to society as a whole, but also that the defendant owed a specific duty running to the particular plaintiff. *See, In re September 11 Litigation*, 280 F.Supp.2d at 290; *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232, 750 N.E.2d 1055, 727 N.Y.S.2d 7 (2001). In order to determine the existence of a duty in New York, the court should consider and balance the following five factors: (1) "the reasonable expectations of the parties and society generally; [2] the proliferation of claims; [3] the likelihood of unlimited or insurer-like liability; [4] disproportionate risk and reparation allocation; and [5] public policies affecting the expansion or limitation of new channels of liability." *Palka*, 83 N.Y.2d at 586, 611 N.Y.S.2d 817, 634 N.E.2d 189; *see also 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Center, Inc.*, 96 N.Y.2d 280, 727 N.Y.S.2d 49, 750

N.E.2d 1097 (2001)(reiterating the five factor balancing test); *In re September 11 Litigation*, 280 F.Supp.2d at 290 (considering the five factors set forth in *Palka* to find the existence of a duty).

■ Amgen is correct in its contention that the manufacturer of a product may not be held liable for negligence where, after a product leaves its possession and control, there is a subsequent modification which substantially alters the product and is the proximate cause of plaintiff's injuries. *See, Cacciola v. Selco Balers, Inc.*, 127 F.Supp.2d 175, 189–190 (E.D.N.Y. 2001).

■ Moreover, plaintiff's allegations against Amgen assert liability based upon design defect, i.e., that the packaging used by Amgen for the Epogen was not tamper-resistant enough. In determining whether a particular design is defective, the issue is "whether the product as designed was 'not reasonably safe' that is, whether it is a product which, if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *Elsroth v. Johnson & Johnson*, 700 F.Supp. 151, 161 (S.D.N.Y.1988). The plaintiff has the burden of establishing that the packaging, as designed, "was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner." *Id.* at 162 (emphasis omitted).

■ Plaintiff cannot establish that it was feasible for Amgen to design the Epogen in a safer manner. Even if Amgen was aware of the diversion and counterfeiting of prescription drugs, and that its packaging could be violated by a counterfeiter, no packaging is completely tamper-proof. *See, e.g. Elsroth*, 700 F.Supp. at

161 (recognizing that tamper-proof packaging of over-the-counter drugs is not possible). Accordingly, even, if plaintiff were permitted to conduct discovery and was able to present evidence of methods Amgen could have employed to make the Epogen more tamper-resistant, since no packaging is tamper-proof, it cannot be said that such alternative packaging would have prevented the counterfeiting. *See, e.g. Id.* at 164 (finding that plaintiff cannot demonstrate that had the manufacturer eliminated gelatin capsules the third party criminals would not have poisoned tablets or caplets instead). Plaintiff's claim, "[a]lthough masquerading as a claim for 'better protection against tampering,' [ ] is, in reality, a claim for tamper-proof packaging;" yet no such packaging exists. *Id.* at 162. Therefore, as a matter of law, Amgen's packaging of the Epogen could not be found defective in its packaging design. *See, e.g. Id.* at 162 (rejecting as a matter of law the plaintiff's contention that the packaging of the Tylenol was defective).

■ Moreover, generally, a manufacturer does not have a duty to anticipate and prevent criminal conduct by third parties, or to design its product in such a way as to anticipate and frustrate criminal tampering. *See, Elsroth,* 700 F.Supp. at 163, 164; *see also Cacciola,* 127 F.Supp.2d at 190 (holding that under New York law, a manufacturer is not obligated to design a product that is impossible to abuse). Further, contrary to plaintiff's contention, the creation of a duty on the part of a manufacturer of prescription drugs under the circumstances herein would create a new source of liability. As noted by Judge Goettel, "[t]he notion that manufacturers should nonetheless be forced to write-off the consequences of determined criminal tampering by third parties as a cost of

doing business would be an unprecedented extension of the common law." *Elsroth,* 700 F.Supp. at 164.

■ In addition, a manufacturer does not have a duty to warn consumers of potential criminal misuses of its product. *See, Elsroth,* 700 F.Supp. at 167. Likewise, a manufacturer does not have a duty to warn that its product is susceptible to criminal misuse, or even that certain of its products may be more susceptible to such tampering than others. *Id.* Accordingly, plaintiff's negligence claim against Amgen is dismissed, since Amgen did not owe him a duty of care under the circumstances of this case [2].

2. ABC

a. Duty

ABC contends that plaintiff's negligence claim against it should be dismissed because it did not have a duty to protect plaintiff from harm caused by the criminal acts of third parties in placing counterfeit labels on the Epogen, particularly since a "special relationship" did not exist between plaintiff and itself.

Plaintiff contends that ABC had a duty, as codified by the federal Food, Drug and Cosmetic Act (FDCA), 21 U.S.C. § 331(a) and (c), not to receive or deliver into interstate commerce a misbranded or counterfeit drug, and that ABC breached that duty by violating the law. Moreover, according to plaintiff, ABC owed him a duty of care because (1) he had a reasonable expectation that the distributors of Epogen would provide only legitimate drugs coming from proper channels, "given the extensive federal regulation of the industry" (Plaintiff's Memorandum in Opposition to ABC's Motion to Dismiss, pp. 6–7);

**2.** In light of this determination, Amgen's contentions regarding the issue of proximate

cause need not be reached.

(2) holding distributors of prescription drugs liable for failing to follow the law will not result in an unreasonable proliferation of claims; (3) there is no likelihood that distributors of prescription drugs will be held to unlimited liability merely by imposing upon them a duty of care to the customers of the drugs they distribute; (4) no party is in a better position to provide safeguards to minimize the chances of tampering or counterfeiting than the distributors of the products; and (5) holding ABC liable would not open a new channel of liability, in light of the duties imposed upon distributors by the FDCA.

■ ABC is correct in its contention that generally, a defendant has no duty to control the conduct of third parties so as to prevent them from harming others, even where, as a practical matter, the defendant can exercise such control. *Johnson,* 304 F.Supp.2d at 394 (citing *D'Amico v. Christie,* 71 N.Y.2d 76, 88, 524 N.Y.S.2d 1, 518 N.E.2d 896 [1987]); *see also Hamilton,* 96 N.Y.2d at 232–233, 727 N.Y.S.2d 7, 750 N.E.2d 1055. However, such a duty may arise when "there is a relationship either between defendant and a third-person tortfeasor that encompasses defendant's actual control of the third person's actions, or between defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others. * * * The key in each is that the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." *Hamilton,* 96 N.Y.2d at 233, 727 N.Y.S.2d 7, 750 N.E.2d 1055; *see also In re September 11 Litigation,* 280 F.Supp.2d at 290.

The circumstances present in this case can be analogized to cases involving the manufacture, marketing, and distribution of illegally obtained handguns. In *Hamilton,* the New York Court of Appeals held that individuals killed by illegally obtained handguns are not owed a duty by the handgun manufacturers to exercise reasonable care in the marketing and distribution of their handguns. 96 N.Y.2d at 240, 727 N.Y.S.2d 7, 750 N.E.2d 1055. However, the court did not hold that all such negligence claims were barred, recognizing that "[t]ort law is ever changing * * *." *Id.* at 242, 727 N.Y.S.2d 7, 750 N.E.2d 1055. Rather, the court based its decision on the plaintiffs' inability to show (1) a direct causal link between the defendants' conduct and the plaintiffs' injuries; (2) that the defendants were "realistically in a position to prevent the wrongs;" (3) that there was any "statistically significant relationship between particular classes of dealers and crime guns;" and (4) that the defendants' products were defective. *Id.* at 234, 236, 727 N.Y.S.2d 7, 750 N.E.2d 1055. Moreover, the court found that the pool of possible plaintiffs was very large, consisting, potentially, of any of the thousands of victims of gun violence; and that plaintiffs failed to present any evidence "tending to show to what degree their risk of injury was enhanced by the presence of negligently marketed and distributed guns, as opposed to the risk presented by all guns in society." *Id.* at 233–235, 727 N.Y.S.2d 7, 750 N.E.2d 1055. In addition, the court in *Hamilton* left open the possibility that a causal connection might be shown between the harm suffered by gunshot victims and the conduct of members of the gun industry, notwithstanding the intervening acts of subsequent purchasers or thieves. 96 N.Y.2d at 234, 727 N.Y.S.2d 7, 750 N.E.2d 1055. Furthermore, the court noted that a manufacturer may be held liable for complicity in dangerous or illegal activity, such as where it sold a product to a retailer with knowledge that the retailer intended to put them to an illegal use. *Id.* at 235, 727 N.Y.S.2d 7, 750 N.E.2d 1055.

Indeed, the Ninth Circuit has found a duty of care on the part of gun manufacturers and distributors in a case where the plaintiffs' theory of negligence against the defendants was not that they were negligent in distributing their firearms to the general public, as in *Hamilton*, but rather that the defendants' distribution scheme specifically targeted criminal users of firearms and created an illegal secondary market for guns. *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1201, 1215 (9th Cir.2003). The Ninth Circuit found, *inter alia*, that the plaintiffs' allegations that the defendants created the illegal secondary firearms market that was intentionally directed at supplying guns to prohibited gun purchasers were sufficient to raise a factual question as to whether the defendants owed the plaintiffs a duty of care so as to preclude dismissal at the pleadings stage. *Id.* at 1204. The court specifically distinguished *Hamilton* on the ground, *inter alia*, that plaintiffs sufficiently alleged a direct link between the manufacturers' and distributors' distribution practices and the illegal sale of the gun used to kill plaintiff. *Id.* at 1206. Further, the court found that the manufacturer and distributors were in a position to prevent the harm alleged by, *inter alia*, modifying their distribution practices. *Id.* at 1207. In addition, the court found that it was "reasonably foreseeable that [the defendants'] negligent behavior and distribution strategy [would] result in guns getting into the hands of people * * * who are forbidden by federal and state law from purchasing a weapon * * * [and] that once these prohibited purchasers obtain[ed] the firearms, they [would] use them for criminal activity." *Id.* at 1204.

In addition, the Ninth Circuit in *Ileto* noted with approval a recent case by the Ohio Supreme Court, *City of Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d 416, 768 N.E.2d 1136 (2002), which also involved a lawsuit against gun manufacturers and distributors for harm caused by the firearms they manufactured, sold and distributed. The Ohio Supreme Court held in that case, *inter alia*, that the negligence issue presented was not whether the defendants owed a duty to control the conduct of third parties; but rather was whether defendants themselves were negligent in the manufacturing, marketing, and distribution of firearms in a way that created an illegal firearms markets that resulted in foreseeable injury. *Id.* The court further held that consequently, a "special relationship" was not required to establish a duty under the circumstances presented therein. *Id.*

■ The holdings of the Ninth Circuit and the Ohio Supreme Court provide persuasive authority for a finding of duty on the part of ABC in this case. Like the plaintiffs' allegations in *Ileto*, plaintiff's theory of negligence against ABC focuses on its affirmative actions in receiving and delivering prescription drugs in the "gray market," thereby creating, or at least facilitating, the existence of the "gray market" which traded in diverted or counterfeit drugs. However, there is more of a direct link between ABC's alleged conduct in receiving or delivering diverted drugs on the "gray market" and plaintiff's injury than that which existed in *Hamilton* and ABC was in the best position to prevent the harm alleged by modifying its practices so as to avoid purchasing its drugs from the "gray market." Accordingly, plaintiff's allegations sufficiently raise factual questions as to whether ABC owed him a duty of care.

In addition, since plaintiff's allegations involve whether ABC was itself negligent in distributing prescription drugs in a such a way as to create or proliferate a "gray market" that permitted the trade of diverted and counterfeit drugs, ABC's reliance

on the "special relationship" rule is misplaced.

Moreover, as recognized by ABC, Judge Hellerstein, although recognizing the hesitancy of New York courts to extend liability to a defendant for the failure to control the conduct of third parties, nevertheless applied the five factor *Palka* test to a "third party harm" case. *In re September 11 Litigation*, 280 F.Supp.2d at 290–295. In balancing the five factors set forth in *Palka*, a duty of care on the part of ABC to plaintiff may be found. First, plaintiff and society generally could have reasonably expected that the heavy regulation of the prescription drug industry would be for the protection of the consumers of such drugs. *See, e.g. In re September 11 Litigation*, 280 F.Supp.2d at 292 (finding that plaintiffs and society in general could have reasonably expected that the screening performed at airports by the Aviation defendants would be for the protection of people on the ground as well as for those in airplanes). Second, there would be no proliferation of claims, so long as the potential plaintiffs "are known and circumscribed by those who have, as a result of [the counterfeiting of prescription drugs], suffered personal injury." *Id.* at 293. Third, the likelihood of "unlimited or insurer-like liability" does not weigh against a finding of duty on the part of ABC, as plaintiff complains of physical injuries directly caused to his person as a result of the counterfeiting of prescription drugs and ABC would only be liable to plaintiff if he sustains his burden of proof. *See, e.g. Id.* (finding that the likelihood of unlimited or insurer-like liability did not weigh heavily against a finding of duty on the part of the Aviation defendants where plaintiffs complained of directly-caused physical injuries to their persons or property, and defendants would be liable only if plaintiffs sustained their burden of proof).

The fourth *Palka* factor, which weighs the "disproportionate risk and reparation allocation," requires an inquiry to determine who was best able to protect against the risks at issue, and weighs the cost and efficacy of imposing such a duty. *In re September 11 Litigation*, 280 F.Supp.2d at 293. Judge Hellerstein found this factor to be the ultimate factor distinguishing that case from other third-party conduct cases in which no duty was found. *Id.* at 293. Although this factor may not weigh as heavily in favor of imposing a duty upon ABC as it did in the *September 11* case, it nevertheless does support the finding of a duty. The FDCA and its corresponding regulations impose a duty upon ABC, as a distributor of prescription drugs, to, *inter alia*, refrain from introducing or delivering into interstate commerce, and from receiving, any misbranded, including counterfeit, drug. *See,* 21 U.S.C. § 331(a) and (c). The same conduct reasonably necessary to comply with that statute is the same as that which would protect the public, and plaintiff, from misbranded or counterfeit drug sales. Accordingly, as in the *September 11* case, ABC already had an existing duty to refrain from the trade of counterfeit or otherwise diverted drugs.

Moreover, and unlike most third party harm cases, where the imposition of a duty would do little to minimize the criminal conduct of third parties, imposing a duty upon ABC to comply with the regulations regarding distribution of prescription drugs might result in a reduction of sales of diverted, counterfeit, or otherwise illegal drugs. ABC, as a distributor of prescription drugs, could best control from whom it purchased prescription drugs, and to whom it delivered the drugs it purchased, and thus may have been in the best position to protect against the trade of counterfeit or diverted prescription drugs. *See, e.g. In re September 11 Litigation*, 280 F.Supp.2d at 293 (finding that the

same activities reasonably necessary to safeguard passengers and crew of airplanes are those that would protect the public as well, and that the Aviation defendants could best control the boarding of airplanes and the provision of reasonable protection against hijackings).

Finally, recognition of a duty on the part of ABC would not substantially expand or create "new channels of liability," the fifth *Palka* factor. As noted above, ABC, as a distributor of prescription drugs, already had a statutory duty to refrain from delivering or receiving misbranded or counterfeit drugs. The same general standard of care governs its duty to consumers of the drugs its distributes. Accordingly, ABC may be found to have owed a duty of care to plaintiff.

b. Proximate Cause

ABC contends that even if it owed a duty to plaintiff, plaintiff's negligence claim against it should be dismissed since he cannot establish proximate cause.

Plaintiff contends, *inter alia*, that since the criminal act of trading in counterfeit drugs in the "gray market" was foreseeable, it did not break the causal connection between ABC's conduct in purchasing the counterfeit Epogen from the "gray market" and selling it to CVS ProCare and plaintiff's injuries.

 To establish proximate cause a plaintiff must establish that the defendant's negligence was a "substantial foreseeable factor in bringing about his or her injury." *Johnson*, 304 F.Supp.2d at 395. The issue of proximate cause is generally a question of fact for the fact finder, unless only one conclusion may be drawn from the established facts. *Id.*

 Contrary to ABC's contention, an intervening criminal act by a third party does not necessarily break the causal connection between the defendant's negligence and the plaintiff's injury. *Johnson,*

304 F.Supp.2d at 395 (citing *Derdiarian v. Felix Contracting Corp.,* 51 N.Y.2d 308, 315, 434 N.Y.S.2d 166, 414 N.E.2d 666 [1980]). Rather, in order to break the causal chain, the intervening criminal act must have been "of such an extraordinary nature or so attenuated from the defendants' conduct that responsibility for the injury should not reasonably be attributed to them." *Johnson*, 304 F.Supp.2d at 395 (citing *Gordon v. Eastern Ry. Supply, Inc.,* 82 N.Y.2d 555, 562, 606 N.Y.S.2d 127, 626 N.E.2d 912 [1993]). "If the intervening act was a foreseeable consequence of the defendant's negligence, he will be held liable. * * * Failure to take reasonable steps to guard against a foreseeable criminal act is negligent." *Id.* The existence and foreseeability of a superceding cause are ordinarily issues of fact for the fact finder. *Id.*

 Whether it was reasonably foreseeable that ABC's distribution practices would result in the criminal diversion, misbranding, or counterfeiting of prescription drugs, which directly caused plaintiff's injuries, is a question of fact which cannot be determined at the pleadings stage. Indeed, since plaintiff has alleged that ABC knew that its distribution practices helped to foster the "gray market," it was reasonably foreseeable that by continuing to do so, a person would be able to counterfeit or misbrand prescription drugs and deliver such drugs to retailers, who would then pass them along to unwary consumers. *See, e.g. Ileto*, 349 F.3d at 1209 (finding that it was reasonably foreseeable that if defendants continued to foster the illegal secondary firearms market, a third party who was prohibited by law from purchasing a gun would be able to purchase one and use it in a criminal manner). Accordingly, the branch of ABC's motion which is to dismiss plaintiff's negligence claim against it is denied.

### 3. CVS ProCare

#### a. Duty

CVS ProCare contends, *inter alia*, that plaintiff's negligence claim against it must be dismissed since he does not allege that it knowingly supplied an inferior or defective product, and it does not have a duty to warn customers of potential criminal misuses of a medication.

Plaintiff contends, *inter alia*, that CVS ProCare's conduct in selling him a drug that was misbranded violated the FDCA and New York State Education Law § 6815 and, thus, constitutes negligence per se. Moreover, according to plaintiff, since the label on the counterfeit Epogen was defective, there was a patent, as opposed to a latent, defect in the medication, for which CVS ProCare can be held liable.

 In New York, a pharmacist may be negligent for injuries sustained by a consumer of a prescription drug if he or she breached his or her duty of care "to exercise the highest practicable degree of prudence, thoughtfulness and vigilance and the most exact and reliable safeguards consistent with the reasonable conduct of business." *Negrin v. Alza Corp.*, 98 Civ. 4772 DAB, 1999 WL 144507, at * 4 (S.D.N.Y. Mar.17, 1999)(internal quotations and citations omitted); *see also Hand v. Krakowski*, 89 A.D.2d 650, 651, 453 N.Y.S.2d 121 (3rd Dept.1982); *France v. State*, 132 Misc.2d 1031, 1032, 506 N.Y.S.2d 254 (N.Y.Ct.Cl.1986). Where a plaintiff establishes that his or her injury was the result of the pharmacist's breach of that duty, the pharmacist can be held liable for negligence. *Negrin*, 1999 WL 144507, at * 4; *France*, 132 Misc.2d at 1032, 506 N.Y.S.2d 254.

New York courts have held that absent any allegation that a pharmacy failed to fill a prescription precisely as directed by the manufacturer and/or physician, or that the plaintiff had a condition of which the pharmacist was aware, rendering prescription of the drug at issue contraindicated, there is no basis to hold the pharmacy liable under theories of negligence, breach of warranty, or strict liability. *See, In re New York County Diet Drug Litigation*, 262 A.D.2d 132, 132–133, 691 N.Y.S.2d 501 (1st Dept.1999); *see also Hand*, 89 A.D.2d at 651, 453 N.Y.S.2d 121 (reversing order granting summary judgment to the pharmacist on the basis, *inter alia*, that a dispensing druggist may have a duty to warn a customer that a prescribed drug is contraindicated and to inquire of the prescribing doctor if such drug should not be discontinued). Moreover, at least one court has held that a pharmacist is not negligent unless he knowingly dispenses a drug that is inferior or defective. *See, Ullman v. Grant*, 114 Misc.2d 220, 221, 450 N.Y.S.2d 955 (N.Y.Sup.Ct.1982). In addition, New York courts have also found liability or culpable conduct on the part of a pharmacy where there was some active negligence on the part of the pharmacist. *See Drennon v. Faris Pharmacy, Inc.*, 197 A.D.2d 863, 602 N.Y.S.2d 473 (4th Dept., 1993)(holding that the plaintiff established a meritorious claim of negligence on the part of the pharmacist in switching the labels on two medications); *In re 882 East 180th Street Drug Corp. v. New York State Educ. Dept.*, 192 A.D.2d 749, 596 N.Y.S.2d 193 (3rd Dept., 1993)(confirming the determination of the Board of Regents finding the pharmacist guilty of negligence for placing previously dispensed drugs in stock, holding misbranded drugs for sale, and willfully holding misbranded drugs and sample drugs for sale); *In re Jacobs v. New York State Educ. Dept.*, 103 A.D.2d 872, 477 N.Y.S.2d 895 (3rd Dept.1984)(confirming the determination of the Board of Regents finding the pharmacist guilty of, *inter alia*, negligence for, among other things, dispensing controlled substances over counterfeit prescriptions and failing

to make reasonable efforts to contact the physician when the authenticity of the prescription was in doubt); *France*, 132 Misc.2d 1031, 506 N.Y.S.2d 254 (finding that the prison pharmacist was negligent for failing to refill the claimant's prescription for almost one month).

The case *Negrin*, upon which CVS ProCare relies in support of dismissal of plaintiff's negligence claim, is distinguishable from the instant case. In that case, Judge Batts dismissed the action against the pharmacy on the basis, *inter alia*, that there were no allegations in the complaint that the prescription "Nicoderm" patch was dispensed improperly without a prescription, or that the prescription was incorrectly filled. *Negrin*, 1999 WL 144507, at * 5. The court found that the complaint was devoid of any allegations that the pharmacist did anything other than correctly fill the prescription, and dispense the product as packaged by the defendant manufacturer. *Id.* The court held that "absent some further allegations, * * * there is no basis under New York law to hold [the pharmacist] liable on theories of negligence, breach of warranty, or strict liability." *Id.* However, in the instant case, the complaint, when liberally construed, can be read to allege that CVS ProCare did not correctly fill the prescription, insofar as the dosage actually delivered to plaintiff was one-twentieth (1/20th) of the dosage prescribed. The complaint also contains "further allegations" of potentially negligent conduct on the part of CVS ProCare, including, *inter alia*, its failure to inspect the label of the medication purchased from ABC, which was purportedly defective on its face. Accordingly, *Negrin* is inapposite to the instant case.

The case *Bichler v. Willing* (58 A.D.2d 331, 397 N.Y.S.2d 57 [1st Dept.1977]), is also distinguishable. In that case, the plaintiff was injured *in utero* when her mother ingested diethylstilbestrol (DES) during the pregnancy. *Id.*, at 332, 397 N.Y.S.2d 57. The court dismissed the negligence and warranty claims against the pharmacist, finding that there was no actual negligence on the pharmacist's part, and that he filled the prescription precisely as directed. *Id.*, at 333, 397 N.Y.S.2d 57. The court held that since there was no allegation that the pharmacist compounded, added to, or took from "the product as it had been prepared by the manufacturer, or that he did anything to change the prescription furnished him, or that he adopted and represented the product as his own, [he], as a matter of law, cannot be said to have been negligent in any of [those] respects." *Id.* Moreover, the court held that the plaintiffs could not recover in negligence on the theory that the pharmacist dispensed the drug without first inspecting or testing it for the purpose of discovering its latent defects. *Id.* However, in the instant case, as noted above, there is at least some indication that CVS ProCare did not fill the prescription precisely as directed. Moreover, since there is an allegation that the label on the Epogen was facially defective, the instant case does not involve a latent defect; but rather a patent defect, for which CVS ProCare may be held liable for failing to discover upon reasonable inspection. Accordingly, *Bichler* is also inapposite and does not warrant dismissal of the negligence claim against CVS ProCare upon the pleadings.

In light of the allegations in the complaint, it cannot be said as a matter of law, at least at the pleadings stage, that CVS ProCare exercised "the highest practicable degree of prudence, thoughtfulness and vigilance and the most exact and reliable safeguards consistent with the reasonable conduct of business" in dispensing the Epogen to plaintiff if its packaging was purportedly facially defective.

**i. Negligence per se**

■ Moreover, under New York law, a defendant is liable for negligence per se if the plaintiff establishes (1) that he or she is among the class of people for whose particular benefit a statute has been enacted; (2) that a private right of action would promote the legislative purpose behind the statute; and (3) that creation of the right would be consistent with the overall legislative scheme. *See, Prohaska v. Sofamor, S.N.C.,* 138 F.Supp.2d 422, 448 (W.D.N.Y. 2001); *Sita v. Danek Medical, Inc.,* 43 F.Supp.2d 245, 260 (E.D.N.Y.1999).

Plaintiff is correct in his contention that violations of the FDCA and the New York State Education Law § 6815 can constitute negligence per se if the violations are shown to have proximately caused his injuries. *See, e.g. Ezagui v. Dow Chemical Corp.,* 598 F.2d 727, 733 (2d Cir.1979)(holding that violations of the FDCA, 21 U.S.C. § 352, and the New York Education Law § 6815, for misbranding a product by providing false or misleading labeling, is negligence per se, provided plaintiff shows that the violations proximately caused the injuries and death of the decedent); *Prohaska,* 138 F.Supp.2d at 448 (holding that a cause of action exists under negligence per se when the underlying claim is for misbranding or otherwise illegally omitting product warnings required by the FDCA); *Sita,* 43 F.Supp.2d at 262 (recognizing that a private cause of action exists for negligence per se upon a violation of the FDCA).

■ 21 U.S.C. § 331(a) prohibits "[t]he introduction or delivery for introduction into interstate commerce of any * * * drug * * * that is adulterated or misbranded." Similarly, 21 U.S.C. § 331(c) prohibits "[t]he receipt in interstate commerce of any * * * drug * * * that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise." Since the Epogen received by CVS ProCare and sold by it to plaintiff

was counterfeit and, thus, arguably "misbranded," there is evidence that CVS ProCare violated the FDCA sufficient to preclude dismissal of the complaint at the pleadings stage.

**b. Proximate Cause**

CVS ProCare contends that plaintiff cannot establish that any of its actions were the proximate cause of his injuries.

■ Plaintiff alleges that CVS ProCare did not take reasonable steps to make its products tamper-resistant, or to verify that the drugs were genuine, notwithstanding that it knew that criminals were counterfeiting pharmaceuticals. Therefore, according to plaintiff, the criminal acts of third parties did not break the causal connection between CVS ProCare's conduct and plaintiff's injuries.

Plaintiff's allegations that CVS ProCare knew of the counterfeiting and diversion of prescription drugs since 1988, and that some drugs may have been purchased on the "gray market," are sufficient to preclude dismissal of his negligence claim against CVS ProCare at the pleadings stage.

**C. Implied Warranties**

**1. Amgen and ABC**

Amgen contends, *inter alia,* that plaintiff's breach of warranty claims are merely duplicative of his negligence claims, and, thus, should be dismissed for the reasons set forth in part B(1), *supra;* and that it did not make any warranties, express or implied, regarding the counterfeit Epogen purchased by plaintiff.

ABC contends that since plaintiff's injury was caused by the criminal acts of third parties, rather than by any defect in the Epogen introduced in the manufacturing or distribution process, it cannot be held

liable under an "implied warranty without privity" theory.

Plaintiff contends that since the proof required for his breach of warranty claims is the same as that required for his negligence claims, he adequately states a cause of action for breach of warranty against Amgen and ABC.

In an analogous case, *Elsroth*, 700 F.Supp. at 154, the decedent was killed after she ingested Tylenol capsules that had been contaminated by a lethal dose of potassium cyanide by unknown third parties. It was undisputed that the criminal tampering of the Tylenol occurred after the product had left the manufacturer's control. *Id.* Judge Goettel found that liability against a retailer under either a strict product liability or warranty claim was limited to defects attributable to the retailer as part of the retail process. *Id.* at 159. In other words, liability under either theory could be established against a retailer who had poisoned or otherwise altered the product, but not under circumstances in which product tampering was caused by an unknown third party. *Id.* Judge Goettel held that although the tampering caused the product to be in an unreasonably dangerous condition when it left the retailer's hands, such defect was attributable solely to the criminal intervention of a third party outside the ordinary parameters of the retail process. *Id.* According to Judge Goettel, although the product was not fit for its intended use, such "lack of fitness was not attributable to a manufacturing or retail defect, as it must be." *Id.* at 160. Accordingly, Judge Goettel rejected plaintiff's claim for breach of the implied warranty of merchantability. *Id.*

■ Likewise, since there is no evidence that Amgen and ABC misbranded or altered the Epogen, and it is undisputed that such misbranding or counterfeiting was the result of tampering by an unknown third party or parties, Amgen and ABC cannot be held liable under a breach of implied warranty theory.

### 2. CVS ProCare

CVS ProCare contends that under New York law, no implied warranties are extended by pharmacies for prescription medications.

Plaintiff concedes that he does not have a viable claim for breach of the implied warranty of fitness for a particular purpose[3]. However, plaintiff contends, *inter alia*, that he adequately pleaded a claim for breach of the implied warranty of merchantability, since the Epogen delivered was not the product promised.

■ If a seller of goods is a merchant, there is an implied contract that the goods will be of merchantable quality. *See, Prohaska*, 138 F.Supp.2d at 448. The inquiry in a warranty claim is whether the product was "fit for the ordinary purposes for which such goods are used." *Id.* (internal quotations and citation omitted).

■ Since CVS ProCare was in privity with plaintiff, the holding in *Elsroth*, as set forth in part C(1), *supra*, is inapplicable to plaintiff's implied warranty claims against it. The only New York court that has specifically addressed this issue rejected plaintiffs' claims of breach of the implied warranties of fitness and merchantability against a pharmacy on the basis that "implied warranties are conditioned on the buyer's reliance upon the skill and judg-

---

**3.** Although plaintiff agrees to voluntarily withdraw this claim, he agrees to do so only without prejudice. However, since plaintiff concedes that he does not have a viable claim for breach of the implied warranty of fitness for a particular purpose, that claim is dismissed with prejudice.

ment of the seller, but when a consumer asks a druggist to fill a prescription * * *, he [or she] does not rely on the druggist's judgment as to whether that particular drug is inherently fit for its intended purpose but rather he [or she] places that confidence and reliance in the physician who prescribed the remedy." *Bichler,* 58 A.D.2d at 333–334, 397 N.Y.S.2d 57. However, as noted above, that case did not involve the filling of a prescription of an adulterated drug; but rather involved a drug that was later determined to produce harmful side effects. Other cases that have dismissed warranty claims also failed to contain evidence that the product was adulterated, misbranded, or otherwise defective, *see, Prohaska,* 138 F.Supp.2d at 448–449; *Presto v. Sandoz Pharmaceuticals Corp.,* 226 Ga.App. 547, 551, 487 S.E.2d 70 (Ga.Ct.App.1997); *Batiste v. American Home Products Corp.,* 32 N.C.App. 1, 12, 231 S.E.2d 269, 276 (N.C.Ct.App.1977); *McLeod v. W.S. Merrell Co., Div. of Richardson–Merrell, Inc.,* 174 So.2d 736 (Fla.1965), and, thus, are distinguishable from the present case. Since there is a question whether the Epogen dispensed to plaintiff by CVS ProCare was fit for the ordinary purposes for which it is used, plaintiff's claim for breach of the implied warranty of merchantability as against CVS ProCare may not be dismissed at the pleadings stage.

### D. Express Warranty

All of the defendants contend that plaintiff's claim for breach of an express warranty, which alleges only that "upon information and belief, defendants warranted that the Epogen was not defective," should be dismissed for lack of specificity. In addition, CVS ProCare maintains that any statement made by it regarding the suitability of the Epogen would not form part of the "basis of the bargain," since plaintiff did not rely upon it in purchasing the medication; but rather relied upon the advice and prescription of his doctor.

Plaintiff does not oppose the branches of Amgen's and ABC's motions which seek dismissal of his breach of an express warranty claim against them, nor does he seek leave to amend his complaint to replead that claim against those defendants. However, with respect to CVS ProCare, plaintiff contends, *inter alia,* that the label on the Epogen, which indicated that the drug was Epogen, manufactured by Amgen, at a strength of 40,000 units per milliliter, constituted an express warranty that the drug was, in fact, what the label said it was. According to plaintiff, since the drug was not, in fact, the Epogen as labeled, CVS ProCare breached an express warranty to him. Plaintiff requests leave to amend his complaint to replead his express warranty claim as against CVS ProCare in the event it is determined that the complaint lacks the required specificity.

Express warranty claims should be dismissed absent specific factual references in the complaint to any oral or written warranties. *See, The Procter & Gamble Co. v. Quality King Distributors, Inc.,* 974 F.Supp. 190, 200 (E.D.N.Y.1997); *Bichler,* 58 A.D.2d at 333, 397 N.Y.S.2d 57. Since plaintiff's complaint fails to set forth any such specific factual references to any oral or written warranty made by any of the defendants, his express warranty claims are dismissed in their entirety.

#### 1. Leave to Amend Complaint

Fed.R.Civ.P. 15(a) provides that leave to amend a complaint "shall be freely given when justice so requires." "If the underlying facts or circumstances relied upon by plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). However, leave to

amend should not be granted where it is futile, or where the amended complaint would not survive a motion to dismiss. *See, Vicioso v. Pisa Bros., Inc.,* No. 98 Civ. 2027 (RWS), 1998 WL 355415, at * 5 (S.D.N.Y. July 1, 1998); *see also Foman,* 371 U.S. at 182, 83 S.Ct. 227.

■■■■ To state a viable express warranty claim against a seller of goods, a plaintiff "must allege that the actionable representation was the 'basis of the bargain.'" *Williams v. Dow Chemical Co.,* 255 F.Supp.2d 219, 230 (S.D.N.Y.2003). New York Uniform Commercial Code (U.C.C.) § 2–313(1)(b) provides that "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty [by the seller] that the goods shall conform to the description." Under section 2–313 of the U.C.C., the "basis of the bargain" element requires a plaintiff to show that he or she relied upon the seller's representations when deciding whether to purchase the goods. *See, In re Rezulin Products Liability Litigation,* 133 F.Supp.2d 272, 291 (S.D.N.Y.2001); *Salisbury v. Purdue Pharma, L.P.,* 166 F.Supp.2d 546, 552 (E.D.Ky.2001)[4]. Under New York law, the reliance required to recover for breach of an express warranty is "no more than reliance on the express warranty as being a part of the bargain between the parties * * * The critical question is not whether the buyer believed in the truth of the warranted information * * *but whether [he] believed [he] was purchasing the [seller's] promise [as to its truth]." *Rogath v. Siebenmann,* 129 F.3d 261, 264 (2d Cir.1997)(citing *CBS Inc. v. Ziff–Davis Publishing Co.,* 75 N.Y.2d 496, 554 N.Y.S.2d 449, 553 N.E.2d 997 [1990] ).

■■■■ Plaintiff is granted leave to amend his complaint to replead his express warranty claim against CVS ProCare, as it cannot be said as a matter of law that the label affixed to the counterfeit Epogen did not contain any written warranties regarding, *inter alia,* the manufacturer and strength of the drug contained therein. *Cf. Bichler,* 58 A.D.2d at 333, 397 N.Y.S.2d 57 (finding that there was no basis for recovery under an express warranty theory where it was not claimed that the bottle containing the prescription drug had any written warranties affixed to it).

Moreover, the cases which have considered the issue of whether a pharmacy can be held liable for breach of an express warranty all involved claims regarding the intrinsic properties of the drug prescribed, i.e. the prescribed drug caused sides effects or addiction. *See, e.g. In re Rezulin Litigation,* 133 F.Supp.2d at 288 (issue against pharmacies was whether pharmacies selling prescription drugs owe a duty to warn patients about the intrinsic properties of the drugs they dispense and whether they warrant the merchantability of those drugs to their customers); *Salisbury,* 166 F.Supp.2d at 550–551 (issue was whether pharmacies were liable for selling OxyContin, a schedule II narcotic drug, and there was no allegation that the pharmacies sold the drug in an altered condition); *Bichler,* 58 A.D.2d at 332, 397 N.Y.S.2d 57 (pharmacist filled prescription for DES precisely as directed). In *In re Rezulin Litigation,* Judge Kaplan set forth the following reasoning holding that the plaintiffs could not state a cause of action for breach of an express warranty:

---

**4.** Although the courts in *In re Rezulin Litigation* and *Salisbury* analyzed the plaintiffs' claims under Mississippi and Kentucky law, respectively, those states' versions of UCC § 2–313 are identical to New York's and, thus, their analysis is applicable to the instant case. *See, e.g. Salisbury,* 166 F.Supp.2d at 552, n. 2 (finding that the court's analysis in *In re Rezulin Litigation* was applicable since the Mississippi and Kentucky versions of UCC § 2–313 were identical).

Patients who purchase prescription drugs from pharmacists do not negotiate or bargain with the pharmacists about the suitability of the product. Even assuming a pharmacist were to make a representation about the safety of a particular drug, the representation would not form "part of the basis of the bargain" * * * because the patient purchases the drug on the basis of discussions with his or her physician. Unlike the buyer-seller relationship in normal sales transactions, the relationship between the patient and pharmacist is a function of a regulatory system requiring that certain drugs be sold solely by prescription of a physician. It is through the pharmacy that the patient purchases the drug, but in only this sense does the pharmacy function as a "seller." The only representations regarding the intrinsic properties of the drug that form the basis of the buyer's purchase are those of the physician. " * * * [I]t is the physicians who make the ultimate decision on whether to prescribe the drug."

The rationale behind finding that a plaintiff cannot state a cause of action against a pharmacy for breach of an express warranty as set forth in *In re Rezulin Litigation*, is inapplicable to the instant case given the circumstances herein. Plaintiff is not alleging that CVS ProCare represented the safety of the drug Epogen; but rather he seeks to assert a claim that CVS ProCare represented that the drug it sold to him was the Epogen as prescribed by his physician, when, in fact, it was not. It cannot be said as a matter of law at this stage of the litigation that

such a representation by CVS ProCare was not "part of the basis of the bargain" between those parties. Accordingly, plaintiff is granted leave to amend his complaint to replead the express warranty claim as against CVS ProCare.

### E. Negligent Misrepresentation and Fraudulent Concealment

All of the defendants contend that plaintiff's claims for negligent misrepresentation and fraudulent concealment should be dismissed for lack of specificity.

Fed.R.Civ.P. 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be · stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fraudulent concealment and negligent misrepresentation claims must meet the heightened pleading requirements of Fed.R.Civ.P. 9(b). *See, Bombardier Capital Inc. v. Naske Air GmbH*, No. 02 CV 10176 DLC, 2003 WL 22137989, at * 3 (S.D.N.Y. Sept.17, 2003). Plaintiff's claims for negligent misrepresentation and fraudulent concealment lack "specifically plead[ed] events which give rise to a strong inference that the defendant[s] had an intent to defraud, knowledge of falsity, or a reckless disregard of the truth," *see, Manliguez v. Joseph*, 226 F.Supp.2d 377, 389 (E.D.N.Y.2002) (internal quotations and citation omitted), and are, therefore, dismissed [5].

### 1. Negligent Misrepresentation

CVS ProCare contends, *inter alia*, that plaintiff cannot establish that it relied on

---

[5.] In light of this determination, and since plaintiff does not seek leave to amend his complaint to replead these claims as against Amgen and ABC, or to replead his fraudulent concealment claim as against CVS ProCare, it is unnecessary to consider the defendants' remaining contentions regarding dismissal of the those claims as against them. However, to the extent plaintiff may be seeking leave to amend his complaint to replead his negligent misrepresentation claim as against CVS ProCare, the merits of that claim are addressed herein.

any representation made by it, since it obtained the medication through a prescription given to him by his doctor; and that plaintiff cannot establish proximate cause.

Plaintiff contends that CVS ProCare can be held liable for negligent misrepresentation because a special relationship exists between a pharmacist and its customer; CVS ProCare misrepresented that the drug provided was the Epogen prescribed by his doctor; and he detrimentally relied on that representation.

■ In order to state a claim for negligent misrepresentation under New York law, the plaintiff must establish: (1) that the defendant owed him or her a duty, as a result of a special relationship, to provide him or her with correct information; (2) that the defendant made a false representation that he or she should have known was incorrect; (3) that the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) that the plaintiff intended to rely and act upon such information; and (5) that the plaintiff reasonably relied on the information to his or her detriment. *See, Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir.2000); *Century Pacific, Inc. v. Hilton Hotels Corp.*, No. 03 Civ. 8258 (SAS), 2004 WL 868211, at * 7 (S.D.N.Y. Apr.21, 2004). In order to establish a prima facie claim of negligent misrepresentation, a plaintiff must show reliance upon a false statement or material misrepresentation or omission made by the defendant to the plaintiff. *See, Prohaska*, 138

F.Supp.2d at 447; *Sita*, 43 F.Supp.2d at 260.

■ Assuming that there existed a special relationship and corresponding duty on the part of CVS ProCare to provide plaintiff with correct information regarding the prescription drug it was providing him, "an issue generally not susceptible to resolution at the pleadings stage," *Century Pacific*, 2004 WL 868211, at * 8 (internal quotations and citation omitted); *see also Bombardier Capital*, 2003 WL 22137989, at * 4 (holding that whether the plaintiff's reliance on a negligent misrepresentation is justified generally raises a question of fact), plaintiff cannot establish the second element necessary to state a negligent representation claim. Plaintiff does not provide any factual allegations from which it may be inferred that CVS ProCare, itself, made any false statement or material misrepresentation to plaintiff. Absent any allegation that CVS ProCare affixed the label, which contained the alleged misrepresentation, to the counterfeit Epogen, plaintiff cannot state a claim for negligent misrepresentation against CVS ProCare. Accordingly, any amendment to the complaint to replead a negligent misrepresentation claim against CVS ProCare would be futile, and leave to amend the complaint to replead this claim is denied.

### F. Punitive Damages [6]

CVS ProCare contends, *inter alia*, that since plaintiff failed to allege that it diluted the Epogen, or knew that Lot # P001091 was counterfeit at the time it filled the

---

**6.** ABC and Amgen do not specifically seek dismissal of plaintiff's punitive damages claim against them. However, since all of the claims against Amgen are dismissed, the plaintiffs' punitive damages claims against it are dismissed as well. *See, e.g. Spanierman Gallery, PSP v. Love*, 03 Civ. 3188 VM, 2003

WL 22480055 (S.D.N.Y. Oct.31, 2003)(dismissing plaintiff's punitive damages claim because all of the plaintiff's other claims had been dismissed); *O'Hearn v. Spence–Chapin Services to Families and Children, Inc.*, 929 F.Supp. 136, 142 (S.D.N.Y.1996)(accord).

prescription, punitive damages would be inappropriate.

Plaintiff contends that a jury could reasonably conclude that CVS ProCare's knowledge that it was purchasing drugs from a dealer in the "gray market," without verifying that the source of the drugs was legitimate, was an action taken with reckless disregard for the safety of others sufficient to justify an award of punitive damages.

Punitive damages are awarded for the purpose of deterrence and retribution. *State Farm Mutual Automobile Ins. Co. v. Campbell,* 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). Accordingly, punitive damages should only be awarded if the defendant's culpability "is so reprehensible" as to warrant the imposition of damages over and above the award of compensatory damages. *Id.* at 419, 123 S.Ct. 1513. In determining the degree of reprehensibility of the defendant's conduct, the court should consider (1) whether the harm caused was physical, as opposed to merely economic; (2) whether the tortious conduct evinced an indifference to, or a reckless disregard of, the health and safety of others; (3) whether the target of the conduct had financial vulnerability; (4) whether the tortious conduct involved repeated actions, or was an isolated incident; and (5) whether the harm was the result of intentional malice, trickery, or deceit, or was a mere accident. *Id.* (citing *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 576–577, 116 S.Ct. 1589, 134 L.Ed.2d 809 [1996] ).

Since plaintiff may be able to establish that he suffered physical harm as a result of the conduct of CVS ProCare in filling his prescription with a counterfeit drug containing a facially defective label, and a jury may infer that such conduct evinced an indifference to, or a reckless disregard of the health and safety of its customers, plaintiff's claim for punitive damages may not be dismissed at the pleadings stage.

### G. CVS ProCare's Cross–Claims against ABC

#### 1. Contractual Indemnification and Contribution

ABC contends that CVS ProCare's cross-claims for contractual contribution and indemnification are expressly barred by sections 8 and 9 of the contract between those parties.[7]

CVS ProCare contends, *inter alia,* that the contract does not bar, but rather expressly authorizes, its cross-claims based upon ABC's negligence.

The contract between CVS ProCare and Bergen Brunswig Drug Company, ABC's predecessor, effective September 17, 2001, provides, in pertinent part, as follows:

8. *No Representation Regarding Products.* [ABC] makes, and shall be deemed to make, no representation or warranty, express or implied, as to the * * * absence of defect, * * * or any other representation or warranty whatsoever, express or implied, with respect to the Pharmaceutical Products supplied pursuant to this Agreement, except that [ABC] has received title conveyed to it by the manufacturer or supplier thereof. [CVS] ProCare understands that [ABC] is not the manufacturer of any products

---

7. The court may consider the parties' contract on this motion to dismiss, since it was incorporated by reference in CVS ProCare's second cross-claim for contractual indemnity and contribution. *See, e.g. International Audiotext Network, Inc. v. American Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995)(holding that the complaint is deemed to include any documents incorporated in it by reference, and any document upon which it solely relies and which is integral to the complaint; and that the court may consider such documents on a motion to dismiss pursuant to Fed.R.Civ.P. 12[b][6] ).

and agrees that [CVS] ProCare will settle all claims, defenses, set-offs and counterclaims it may have with or against the manufacturer thereof directly with the manufacturer and will not assert any such claims, defenses, set-offs or counterclaims against [ABC], *except to the extent that [ABC] has acted negligently or violated the representation made by [ABC] pursuant to this Section 8.* [CVS] ProCare's acknowledgment or deemed acknowledgment of receipt of Pharmaceutical Products shall constitute [CVS] ProCare's acknowledgment and agreement that such products are fit to dispense or distribute through its locations. [CVS] ProCare acknowledges that [ABC] has made no representation or warranty, written, oral or implied about the Pharmaceutical Products or their fitness for any purpose.

9. *Disclaimer of Liability.* Except for [ABC's] representation regarding title made in Section 8 above * * *, [ABC] specifically and expressly disclaims all warranties, express or implied, written or oral, including but not limited to those of merchantability and fitness for a particular purpose regarding the products or services provided hereunder. [CVS] ProCare agrees that [ABC] * * * will not be liable to [CVS] ProCare for any liability, claim, loss, damage (consequential or otherwise) or expense of any kind caused, directly or indirectly: (a) by the inadequacy of the Pharmaceutical Products for any purpose, (b) by any deficiency or defect in or about the Pharmaceutical Products, * * * or (e) death or bodily injury which may be caused by the Pharmaceutical Product. *The foregoing disclaimer shall not preclude recovery by [CVS] ProCare for negligence by [ABC] * * *.*

(emphasis added).

▪ As noted in part B(2), *supra*, ABC may be found liable for its own negligence

in receiving and delivering misbranded and counterfeit drugs. Since the contract between ABC and CVS ProCare expressly excludes from ABC's disclaimer of liability recovery by CVS ProCare for ABC's negligence, dismissal of CVS ProCare's cross-claim for contractual indemnification and contribution is inappropriate at the pleadings stage.

2. Common–Law Indemnification

ABC contends, *inter alia,* that CVS ProCare's cross-claims for common law indemnity should also be dismissed, since CVS ProCare's liability, if any, to plaintiff would not be "purely vicarious."

CVS ProCare contends, *inter alia,* that its liability is purely vicarious, since its purported role in causing plaintiff's injuries was solely passive, as it was unaware of the counterfeit nature of the Epogen when it provided the drug to plaintiff.

▪ Under New York law, the common law right to indemnification "arises when one party is compelled to pay for the wrong of another." *Mallouris v. Re Spec Corp.,* No. 02 Civ. 8001 NRB, 2003 WL 22966287, at * 2 (S.D.N.Y. Dec.15, 2003)(citing *Twitchell v. Town of Pittsford,* 106 A.D.2d 903, 905, 483 N.Y.S.2d 524 [4th Dept.1984] ). Accordingly, the common law right to indemnification arises only where a party's liability is based upon the wrongdoing of the party from whom indemnification is sought. *Mallouris,* 2003 WL 22966287, at * 2; *see also Guzman v. Haven Plaza Hous. Dev. Fund Co.,* 69 N.Y.2d 559, 567–568, 516 N.Y.S.2d 451, 509 N.E.2d 51 (1987). However, where a party has "itself participated to some degree in the wrongdoing [it] cannot receive the benefit of the [common law indemnity] doctrine;" but rather it may only receive contribution. *Durabla Mfg. Co. v. Goodyear Tire and Rubber Co.,* 992 F.Supp. 657, 660 (S.D.N.Y.1998)(citing *Trustees of*

*Columbia Univ. v. Mitchell/Giurgola Assocs.*, 109 A.D.2d 449, 492 N.Y.S.2d 371, 375 [1st Dept.1985] ); *see also Ins. Co. of North America v. Historic Cohoes II*, 879 F.Supp. 222, 228 (N.D.N.Y.1995)(holding that if the party seeking indemnity is held liable in part because of its own negligence, common law indemnification is unavailable and the only remedy is contribution).

■ If CVS ProCare is found to be liable to plaintiff for negligence, it would not be entitled to common law indemnification against ABC, as each party would be independently liable to plaintiff for its own negligence. *See, e.g. Historic Cohoes*, 879 F.Supp. at 228 (finding that the parties against whom a negligence claim was asserted may not seek common law indemnification since if they are held liable, it will be because they were found to have been at least partly responsible for the losses in question). However, in the event CVS ProCare is found liable to plaintiff solely for breach of the implied warranty of merchantability, and not as a result of any negligence on its part, such liability is truly vicarious and, thus, may support a claim for common law indemnification against ABC in the event ABC is found to have been actively negligent. *See, e.g. Durabla Mfg.*, 992 F.Supp. at 660 (holding that plaintiff-distributor stated a claim for common law indemnification against defendants-manufacturers based on warranties of suitability and merchantability, since liability under an implied warranty theory is truly vicarious). Accordingly, dismissal of CVS ProCare's cross claim for common law indemnification at this stage of the litigation would be premature.

### 3. Apportionment and Contribution

ABC contends that CVS ProCare's cross-claim for contribution or apportionment should be dismissed because plaintiff's injuries were not the result of a breach of any duty by ABC.

CVS ProCare contends, *inter alia*, that this branch of ABC's motion is premature.

■ In light of the determination in part B(2), *supra*, that ABC may have owed a duty to plaintiff, ABC's contention is without merit. In the event ABC is found liable to plaintiff for negligence, CVS ProCare may be entitled to contribution and apportionment of fault. Accordingly, dismissal of CVS ProCare's cross claim against ABC for apportionment and contribution would be premature absent a determination of the parties' respective fault.

### III. CONCLUSION

(1) Amgen's motion to dismiss is granted and the complaint is dismissed in its entirety as against Amgen; (2) the branches of ABC's motion which are (a) to dismiss plaintiff's negligence claims against it, and (b) to dismiss CVS ProCare's cross claims against it, are denied; (3) the branches of ABC's motion which are to dismiss plaintiff's claims for breach of implied and express warranties, negligent misrepresentation, and fraudulent concealment are granted and those claims are dismissed as against ABC; (4) the branches of CVS ProCare's motion which are to dismiss plaintiff's claims for negligence, breach of the implied warranty of merchantability, and punitive damages are denied; (5) the branches of CVS ProCare's motion which are to dismiss plaintiff's claims for breach of the implied warranty of fitness, breach of an express warranty, negligent misrepresentation, and fraudulent concealment are granted and those claims are dismissed as against CVS ProCare; and (6) plaintiff is granted leave to amend his complaint to replead his express warranty claim as against CVS ProCare. Should plaintiff choose to amend his complaint in accordance with this order, he

shall do so within twenty (20) days of the date of this order.

SO ORDERED.